

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |
|---|---|
| **Cheryl Turpin** ) | |
| ) | Civil No. _3:22cv735_ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **Glenn Youngkin**, Governor of Virginia, in ) his official capacity, ) | |
| ) | |
| **L. Louise Lucas**, Senate President Pro ) Tempore, in in her official capacity, ) | |
| ) | |
| **Robert Brink**, Chairman of the State Board ) of Elections, in his official capacity, ) | |
| ) | |
| **John O'Bannon**, Vice Chair of the State ) Board of Elections, in his official capacity, ) | |
| ) | |
| **Georgia Alvis Long**, Secretary of the State ) Board of Elections, in her official capacity, ) | |
| ) | |
| **Susan Beals**, Commissioner of the State ) Board of Elections, in her official capacity, ) | |
| ) | |
| **Donald Merricks**, member of the State ) Board of Elections, in his official capacity, ) | |
| ) | |
| **Angela Chiang**, member of the State Board ) of Elections, in her official capacity, ) | |
| ) | |
| **Democratic Party of Virginia** ~served Susan Swecker~ ) | |
| ) | |
| **Susan Swecker**, Chairwoman of the ) Democratic Party of Virginia, in her official ) capacity, ) | |
| ) | |
| **Sandra Brandt**, Chairwoman of the ) Second Congressional District Democratic ) Committee, in her official capacity, ) | |
| ) | |

Defendants.                              )
_____ )

## PETITION FOR DECLARATORY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTION

Now comes Plaintiff Cheryl Turpin, *pro se*, filing the complaint herein, raising the constitutional and other matters discussed below, asking the Court to declare as unconstitutional the $5,000 filing fee required in the recent Democratic nomination process for the Seventh State Senate District, to declare the statutory scheme delegating legislative power to the Democratic Party of Virginia as an unconstitutional delegation of such public power, to declare as applied the five-day statutory limit on the campaign and process created to choose said nominee, to declare null and void the nomination of the only candidate paying the unconstitutional $5,000 fee, to award damages of at least $1 dollar, to order a new constitutionally constituted nomination process, and to issue a preliminary injunction to prevent the Virginia State Board of Elections from ordering the name of the individual awarded the nomination as a result of this unconstitutional fee system be placed on the January 10, 2023 Special Election ballot.

## THE IMPORTANCE OF THE CONSTITUTION PRINCILES RAISED HEREIN

1.    This Complaint addresses serious and unfortunately long-standing constitutional infirmities with the statutory scheme created by the General Assembly and implemented by the Democratic and Republican Parties for those nomination processes run by the respective parties for Special Elections and all other nominations not decided by the annual state-run primary generally held in June of each year.

2.    While the instant complaint centers on the recently completed Democratic process for choosing the party's nominee for the upcoming Special Election on January 10, 2023 to fill a vacancy in the Seventh State Senate District, the violations of the constitutional principles herein discussed also unfortunately found in how Democratic nominees are chosen for local city and county offices in many jurisdictions across the Commonwealth (precisely how Republicans chose such nominees is not known to Plaintiff).

3.    The continued failure of the General Assembly of Virginia, and the leaders of the two major parties, to correct these infirmities, even though certain ones were long prohibited by federal court decisions, continues to threaten the credibility of electoral systems, at the very moment the public is self evidentially increasingly skeptical of the fairness of the system.

4.    The $5,000 filing fee and nomination process at issue in this instant matter was imposed by the relevant entities of the Democratic Party of Virginia in the Seventh State Senatorial District.

5.    This Seventh District voting population comes mostly from Virginia Beach City (roughly 95%) and the adjacent City of Norfolk (roughly 5%).

6.    "The filing fee requirement…(in a) party primary…is the creature of state legislative choice" and thus "state action" under the Constitution of the United States. *Bullock v. Carter*, 405 U.S. 134, 140 (1972).

7.    In the seminal case of *Harper v. Virginia Board of Elections*, 383 U.S. 663, (1966), the U.S. Supreme Court ruled that imposing a $1.50 "poll tax" violated the U.S. Constitution since "it makes the affluence of the voter or payment of any fee an electoral standard." Id at 666.

8.    *Harper* concluded "wealth or fee paying has…no relation to voting qualifications (and thus) the right to vote is too precious, too fundamental, to be so burdened or conditions." Id at 670.

9.    Six years later, *Bullock* centered on a logical next step in such constitutional jurisprudence, namely the issue of imposing substantial filing fees on candidates as a prerequisite to their qualifying for the primary ballot.

10.    While there is no specific fundamental constitutional right to be a candidate, *Bullock* found "laws that affect candidates always have at least some…correlative effect on voters." Id at 143.

11.    When a filing fee regime operates in an exclusionary fashion, the "effect of this exclusionary mechanism on voters is neither incidental nor remote." Id at 144.

12.    As *Bullock* observed, there "is no escape from the conclusion that the imposition of filing fees as high (as in this case) tends to limit the number of candidates entering the primaries." Id at 145.

13.    Accordingly, the scheme is "denying an undetermined number of voters the opportunity to vote for candidates of their choice." Id at 149.

14.    While *Bullock* said that nothing in the decision "is intended to cast doubt on reasonable candidate filing fees," the opinion did sustain the lower court finding that the state filing fee statutes were an unconstitutional violation of the Equal Protection Clause. Id a137, 149.

15.  In that regard, one of the filing fees voided involved "$6,300 (amounting) to *32% of the $19,700 annual salary* for County Judge in Tarrant County." Id at 149, fn 10 (Emphasis added).

16.  As *Bullock* noted, "payment of the fee is an absolute prerequisite" to getting on the ballot under Texas law, there being no "alternate procedure such as submitting instead a certain predetermined number of signatures on a candidate petition." Id at 137.

17.  In *Bullock*, the size of the fees was explicitly authorized by statute. *Carter v. Dies*, 321 F. Supp. 1358 (1970), the three-judge opinion upheld by *Bullock*.

18.  The annual salary of a member of the Senate of Virginia is set by law at $18,000.

19.  Accordingly, the $5,000 filing fee is equal to *27.8% of this $18,000 annual salary*, roughly the same incredibly oversized percentage declared per se unconstitutional in *Bullock*.

20.  By contrast, other filing fees levied, for example by the Virginia Beach City Democratic Committee for local offices, with far higher salaries, are substantially less, running between 2 to 2.5% in the latest round of nominations.

21.  By statutory law, the filing fee for a candidate wanting to participate in the regularly scheduled state-run Democratic nomination primary process usually held in June of each year is set as 2% of the annual salary for those individuals running for Governor, Lt. Governor, Attorney General, State Senator or Delegate.

22.  In terms of a candidate for the nomination for any State Senate seat, this equals a flat $360 filing fee for any candidate in all 40 Senate Districts across the Commonwealth allowed under Article IV, Section 2 of the Constitution of Virginia.

23.  Accordingly, the arbitrary filing fee demanded by the authorized entities of the Democratic Party of Virginia in this instant matter is ***roughly 14 times higher, or 1388% greater***, than the filing fee set by state law for the state-run primary for Senate nominations.

24.  The filing fee to run for the Democratic nomination for Governor in the most recent such election equaled $3,500, the highest of any such fee in a state-run primary.

25.  As a legal matter, there is no direct statutory authority authorizing either the Republican Party or Democratic Party to impose a filing fee for party-run nomination processes, much less the authority to impose a filing fee any level equal to 27.8% of the annual salary for the office being sought. Virginia Code Section 24.2-508.

26.  Based on the Democratic Party of Virginia's reading of legislative power delegated to them, a $50,000 filing fee is legally permitted should they choose to impose it.

27.  In that regard, it is useful to point out that a three-judge court convened in the Fourth Circuit cited a lower district court analysis finding *Bullock* had "invalidat[ed] mandatory ballot fees of over $1000." *Dixon v. Md. State Administrative Board of Elections*, 878 F. 2d 776, 778 (1989).

28.  Upon information and belief, there is no federal decision in any Circuit, much less any case in Virginia, upholding the imposition of a mandatory filing fee equal to 27.8% of the annual salary of the office sought.

29.  The unconstitutional delegation of legislative authority to the two major state parties is unconstitutional because the state law granting such power contains no guidance, indeed no criteria, limiting the size of the filing fee for the Special Election at issue in this matter. *General Electric v. New York State Dept. of Labor,* 936 F. 2d 1448 (2nd Cir. 1991).

30.  Indeed, *Eubank v. City of Richmond*, 226 U.S. 137 (1912) struck down a legislative transfer of governing power because the ordinance at issue "creates no standard by which the power thus given is to be exercised." Id at 144.

31.  Since the seminal case of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Supreme Court has made clear the due process clause places limits on how a state legislature may delegate power it can delegate to other individuals or entities.

32.  Upon information and belief, the filing fees used around the state for nominations in Special Elections for the State Senate, among other offices, have wide divergences, both between different Democratic Party committees and as compared to the fess impose by different Republican Party committees.

33.  Anyone reading the Democratic Party of Virginia's Party Plan, the group's foundational document, discovers Democrats themselves believe a fair nomination process in a Special Election requires at least seven days prior notice as to the time, place, and method of selection for all potential candidates and their supporters, with greater notice encouraged if at all possible. The Party Plan is available at vademocrats.org/your-party.

34.  Yet state law requires political parties to determine the method of nomination, the time and place, and complete the selection process within five days of the issuance of the Writ of Election for a Special Election, as occurred in the instant case. Va. Code Section 24.2-510(5) (ii).

35.  The creation of a vacancy in the office of State Senator from the Seventh District resulted from the outcome of the 2022 federal congressional elections.

36. The winner in the Second Congressional District, Jen Kiggans of Virginia Beach, had been serving as the State Senator from the Seventh Senate District.

37. This in turn created a question as to whether Governor Glenn Youngkin or State Senate President Pro Tempore Louise Lucas had the appropriate authority to issue the required Writ of Election. Article IV, Section 7 of the Constitution of Virginia.

38. Accordingly, they decided to each issue a Writ of Election on the same day setting the Special Election for same January 10, 2021, date.

39. Senator Lucas, a backer of Seventh District State Senate hopeful Aaron Rouse, knew that once she issued her Writ, there would be only five days for the Democratic Party to select a method of nomination and then implement the chosen method.

40. As a long-time officer of the State Democratic Party, she and her Democratic leadership colleagues knew the Party Plan didn't believe such a short period of time was fair to either potential candidates or Democratic Party voters.

41. There is nothing in state law prohibiting either the Governor or the Senate President Pro Tempore from providing the following notice to any interested candidate and his/her supporters, to wit: Beware that in X days from now, a formal Writ of Election ordering a Special Election will be issued, at which time there will be only five days before the nominating process must produce a winner.

42. Neither the Governor nor the Senate President, so acted.

43. State law gives the Democrats different options to choose their nominee for a Special Election, either a convention process or a caucus process. There is no formal primary election type process. Va. Code Section 24.2 510.

44. The Party chose in this instant matter to use an unassembled caucus process, commonly referenced in political parlance as a "firehouse primary."

45. However, it is not considered a "primary" under state law as it is not run by the state.

46. As a legal matter, a "firehouse primary" is termed a "caucus" under Virginia Code Section 24.2-510.

47. The Legislative Senate District Seven Nominating Committee should have issued the "Call to Caucus" under the Party Plan.

48. It isn't clear from the Call To Caucus (hereinafter referenced as "The Call") whether this group did its fact issue this document.

49. The Call details the salient rules and regulations governing the nomination process.

50. The Call set the "firehouse primary" for Saturday, November 19, 2022.

51. In a "firehouse primary" process, voters can only cast their ballots at the location or locations listed in The Call.

52. The Call listed one location in Virginia Beach and one location in Norfolk.

53. The Call listed the times those voting locations would be open on November 19.

54. The Call discussed the possibility of only one individual being deemed to have met the requirements to be a duly qualified candidate in the "firehouse primary."

55.  "If only one person files properly to be a candidate" explains The Call, "the Legislative Senate District 7 Chair may cancel the election and declare that person the nominee."

56.  It appears Sandra Brandt, Chair of the Second Congressional District Democratic Committee, decided to function as the Legislative Senate District 7 Nominating Committee Chair for purposes of exercising the powers given to this position by The Call.

57.  Ms. Brandt apparently made the decision on November 17 to cancel the November 19 "firehouse primary" after she determined her preferred candidate, Mr. Aaron Rouse, had been the only person to duly qualify to have his name listed on the ballot.

58.  Ms. Brandt appears to have unilaterally decided to cancel the election and declare Mr. Rouse the nominee.

59.  The leading Party officials were all, or at least mostly, backing Mr. Rouse, a millionaire former professional football player.

60.  He had never run for state legislative office before.

61.  A female candidate, a proven voter getter in this Senate District, also wanted to run.

62.  Plaintiff Cheryl Turpin, a former member of the House of Delegates, had been the Democratic nominee in the Seventh Senate District during the 2019 general election.

63.  She won her nomination in a three-way June primary contest.

64.  There were 5,566 votes cast in that election.

65.  Ms. Turpin received 58.7%.

66.  In the 2019 general election, 58,804 Virginians voted.

67. Ms. Turpin got 49.5% of the vote, losing to the winning Republican candidate by a mere 511 votes.

68. Accordingly, by the normative measures used to determine the validity of candidates, Ms. Turpin was by far the leading and obvious choice to be the nominee in this Special Election given her near win last time.

69. However, it appears she had angered certain powerful Party leaders by her independence especially on issues of importance to the win in her district.

70. At the same time, Republican Governor Youngkin and his party would prefer her not to be the Democratic candidate in this Special Election.

71. While the Writ took pains to put the General Election at the last possible date prior to the opening of the 2023 General Assembly Session, the Writ was issued to ensure the least amount of notice for anyone interested in challenging Mr. Rouse.

72. Ms. Turpin, in the time frame required of a candidate, filed the required papers except for paying the unconstitutional $5,000 fee, writing to Ms. Brandt about the unfairness and the unconstitutionality of the mandatory filing fee.

73. Mr. Rouse's nomination, by the Party's own admission, is based solely on his having sufficient wealth to pay the fee.

74. Based on *Bullock*, both a candidate denied fair ballot access, and even more importantly, the voters supporting said candidate who have now been denied the right to vote for their preferred candidate, have standing to challenge the constitutional flaws discussed herein.

## **JURISDICTION AND VENUE**

75.   This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C 1331, as this case involves questions of federal law, and over a request for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Procedure.

76.   Venue is proper in, and Defendants are subject to, the personal jurisdiction of this Court because Defendants are citizens of Virginia, operate in their official capacities in the Eastern District of Virginia, and all or most of the events giving rise to this action occurred in this District.

77.   Plaintiff likewise resides in this District.

78.   The seat of government for the Commonwealth of Virginia is this District.


## PARTIES

79.   Plaintiff Cheryl Turpin resides in Virginia Beach.

80.   Turpin is a qualified voter in the Senate District at issue in this matter.

81.   Turpin filed to run for the Democratic nomination but her filing was rejected by the Democratic Party for listing on the "firehouse primary" ballot solely for failing to pay the $5,000 fee.

82.   Glenn Youngkin is the Governor of the Commonwealth of Virginia. He is a citizen of the Commonwealth of Virginia. His office is in Richmond. He is being sued in his official capacity.

83.  Senator L. Louise Lucas is Virginia Senate President Pro Tempore. She is a citizen of the Commonwealth of Virginia. Her Senate office is located in Richmond. She is being sued in her official capacity.

84.  Defendant Robert Brink is the Chair of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

85.  Defendant John O'Bannon is the Vice Chair of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

86.  Defendant Georgia Alvis Long is the Secretary of the State Board of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

87.  Defendant Donald Merricks is a member of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

88.  Defendant Angela Chiang is a member of the State Board of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

89.  Defendant Susan Beals is the Commissioner of the Virginia Department of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

90. The Virginia State Board of Elections ("hereinafter State Board") is tasked by state law to ensure "legality and purity in all elections" and to "ensure that major risks to election integrity are…addressed as necessary to promote election uniformity, legality and purity." Va. Code 24.2-103(A).

91. The Virginia Department of Elections is the operational arm used by the State Board to ensure that the State Board is fulfilling its duty to ensure the integrity, purity, and uniformity of state elections.

92. The Defendant Democratic Party of Virginia is designated as one of two political organizations recognized as political party for purposes of Va. Code Section 24.2-508 et seq.

93. The Party is headquartered in Richmond.

94. Defendant Susan Swecker is the Chairwoman of the Democratic Party of Virginia. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond. She is being sued in her official capacity.

95. Defendant Sandra Brandt is designated as the Legislative Senate District 7 Chair by the Call to Caucus. In that role, she made the decision to declare the Plaintiff ineligible to run in the nomination process and then declared Mr. Rouse the winner because he had filed the $5,000 fee. She is a citizen of the Commonwealth of Virginia. She resides in this District. She is being sued in her official capacity.

## STATEMENT OF FACTS

96. Article IV, Section 2 of the Constitution of Virginia allows the State Senate to consist of no more than 40 individuals elected from 40 different districts.

97. The population of the Seventh Senate District is drawn almost entirely of those residing in the City of Virginia Beach along with a relatively small number of residents in the City of Norfolk.

98. A general election to choose a State Senator to represent Senate District Seven had last been held in November of 2019.

99. The Republican Party nominated Ms. Jen Kiggans.

100. The Democratic Party nominated Plaintiff Ms. Cheryl Turpin.

101. In a hard-fought election, Ms. Kiggans barely nosed out Ms. Turpin by 511 votes.

102. Plaintiff Turpin had already indicated last year her intention to run again.

103. Senator Kiggans had likewise been ready to run for reelection next year.

104. Knowing it would be difficult to defeat Turpin for the Senate nomination, the Party leadership had already begun publicly lining up behind Mr. Rouse, as the millionaire professional football star had already declared his intention to challenge Ms. Turpin.

105. Mr. Rouse is finishing his first term on the Virginia Beach City Council.

106. He didn't seek reelection this year.

107. However, in the recently completed mid-term congressional elections in Virginia's Second Congressional District, Ms. Kiggans, the GOP nominee, scored an upset over the incumbent Democratic congresswoman.

108. As a legal matter, she would need to resign from the State Senate before being eligible to take her seat in the new Congress next January.

109. The next regular session of the General Assembly starts on January 11, 2023.

110. Ms. Kiggans decided to resign before her victory had been officially declared under Virginia law.

111. A Writ of Election must be issued to call any Special Election to fill a vacancy in a state legislative office, Va. Code Section 24.2-683.

112. However, a dispute did arise between Governor Youngkin and Senate President Pro Tempore Lucas as to which individual is authorized under that Code Section to issue the Writ of Election.

113. The custom in Virginia is to fill such a vacancy in time for the newly elected Senator to take her or his seat in time for the opening day of the next regular General Assembly session.

114. Hoping to avoid a legal fight, the Governor and the Senate President Pro Tempore agreed to each issue Writs setting the Special Election for January 10, 2023, the last date allowed under Virginia law to conduct such an election prior to the opening of the next regular General Assembly Session.

115. For reasons that defy not merely the logic and fairness of the political process, but the fundamental right of citizens to cast an effective ballot enshrined in the First Amendment to the Constitution of the United States, the nominees of any political party must be selected within five days of the issuance of the Writ of Election. Va. Code Section 24.2-510(5).

116. Therefore, had the Governor and the Senate President Pro Tempore wanted to respect the rights of the voters and the potential candidates, they could have first given everyone prior notice that they would be officially issuing the Writ at a future date, in the week after Thanksgiving for example.

117. In this way, they could have provided time for notice of the Special Election, the time and place for casting ballots, to better reach all potential voters, moreover, providing far more time for any prospective candidate to mount at least the semblance of a campaign.

118. There is nothing in state law to have prevented the Governor and Senate President Pro Tempore from taking this most reasonable and sensible action, one consistent with the values in the First Amendment to the Constitution of the United States and the Bill of Rights found in Article I of the Constitution of Virginia.

119. But the Governor and the Senate President Pro Tempore apparently had their own political reasons for wanting as little time as possible before there could be any challenge to the preferred candidates of the Party leaders of both Parties.

120. As indicated *supra*, the timeline required to adhere to the Writ is unfair to candidates and voters according to the Democratic Party of Virginia Party Plan.

121. In point of fact, those wanting to run for the nomination had to get certain paperwork done and properly submitted by 1600 hours on November 17.

122. Yet the actual Call detailing the method of nomination, rules, and regulations only got published and promulgated to Plaintiff Turpin and her supporters roughly 24 hours to 48 hours previously.

123. Thus the leaders of both political parties can be presumed to know the damage being done to constitutionally protected voting rights and the right of association.

## THE LAW OF THE CASE: STARTING WITH THE $5,000 FILING FEE

124. Article II, Section 4 of the Constitution of Virginia gives the State Legislature full power to determine the process for electing State Senators, including the process of nominating the candidates to run in the Special Election at issue in this instant matter.

125. The Democratic Party of Virginia (hereinafter the "DPVA") is one of two political organizations recognized as a "political party" in Virginia election law. Va. Code Section 24.2-101.

126. As such, it accepts certain legal benefits not available to the unofficial minor parties such as having their nominees listed on the general election ballot without having to satisfy the signature requirement otherwise a perquisite to such ballot access. Va. Code Section 24.2-506(A).

127. Such legal benefits include a delegation of legislative power to the effect that the State Democratic Party of Virginia has certain powers to decide how to conduct the process of

choosing a party nominee for the Special Election at issue in the instant matter. Va. Code Section 24.2-508.

128. This grant of power from the General Assembly has been made without any restriction or specific criteria contemplated by the U.S. Constitution. *General Electric, supra.*

129. It is well settled that a nomination process of a political party such as the DPVA is considered "state action" and thus even though the DPVA is not a government entity, the nomination so chosen must comply with the Constitution of the United State. *Smith v. Allwright*, 321 U.S. 649 (1944).

130. The right to vote is a "fundamental political right." *Yick Wo v. Hopkins, supra* at 370.

131. Indeed the right to vote has been deemed "preservative of other basic civil and political rights" and thus any potential "infringement of the rights of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561, 562 (1964).

132. *Reynolds*, a seminal case on the rights of citizens in state legislative elections, further said the constitutionally protected right to vote includes the right to cast an effective vote. Id at 565.

133. The Supreme Court in *Williams v. Rhodes*, 393 U.S. 23 (1968), went further, saying the right to cast an effective vote wasn't merely covered by the 14th Amendment, but it also includes the First Amendment right "to associate for the advancement of political beliefs." Id at 30.

134. When a state such as Virginia, either directly through a statutory enactment, or indirectly through statutory enactment delegating legislative power to a private organization such as a political party, allows such a statutory scheme to burden a First Amendment right, the state can only justify the ensuring state action by showing the scheme is necessary to support a compelling state interest. *Williams, supra*, at 30.

135. In such circumstances, the normal presumption of constitutionality provided to state legislative enactments is of no moment, as such a presumption cannot be the basis for deciding issues involving fundamental political rights. *Kramer v. Union Free School District*, 359 U.S. 621, 628 (1969).

136. For example, the Supreme Court in *Harper* ruled that even a $1.50 poll tax placed too heavy a burden for the First Amendment to bear, as even this small amount weighed down the right to vote through an impermissible wealth factor.

137. *Bullock* therefore took the next logical step after *Harper* by focusing on the impact of steep candidate filing fees on choices available to voters for the purpose of their being able to effectively use their right to vote.

138. *Bullock* ruled the state action doctrine did apply to state statutes authorizing political parties to impose steep filing fees in a nomination contest. Id at 140 and 141.

139. The *Bullock* case involved, among other aspects, a nomination process where a filing fee equaled roughly 32% of the annual salary of the office sought.

140. As previously indicated, this is strikingly close to the filing fee structure in this instant matter, which equates to 27.8% of the annual salary of a Virginia State Senator.

141. According to *Bullock*, the "threshold question" to be resolved was whether the state only needed to offer a "rational basis" to justify this fee structure, or whether instead the huge fee percentage "must withstand a more rigid standard of review." Id at 142.

142. *Bullock* decided the "very size" of the fees at issue colors them with a "patently exclusionary character." Id at 143.

143. Besides the fee's damage to potential candidates, the "effect of this exclusionary mechanism on voters is neither incidental nor remote." Id at 143 and 144.

144. After due consideration, *Bullock* determined such large fees had "a real and appreciable impact on the exercise of the franchise," and thus laws permitting such fees had to be "closely scrutinized" and "found reasonably necessary to the accomplishment of legitimate state interests in order to pass constitutional muster." Id at 144.

145. The state "erected a system that utilizes" an arbitrary wealth related criterion "excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice." Id at 149.

146. A few years after *Bullock*, the U.S. Supreme Court had occasion to discuss other aspects of exclusionary filing fee systems in *Lubin v. Panish*, 415 U.S. 709 (1973).

147. *Lubin* expanded on the discussion in *Bullock* by declaring the "right to vote" is "heavily burdened" if that vote may be cast only for one of two candidates in a primary election at a time when other candidates are clamoring for a place on the ballot." Id at 716.

148. In the instant matter, the exclusionary fee resulted in voters having no choice whatsoever, as the Party bosses simply cancelled the "firehouse primary" and declared their preferred candidate nominated without a single vote being cast, a situation far more extreme and constitutionally damaging than in *Bullock* or *Lubin*.

149. As *Lubin* points out, the ability to pay "a large filing fee...is not a certain test of whether (a) candidacy is serious or spurious." Id at 717.

150. "A wealthy candidate with not the remotest chance of election may secure a place on the ballot by writing a big check." Id.

151. *Lubin* pointed out the nomination of "candidates solely on the basis of the ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of (a) State's legitimate election interests." Id 718.

152. This principle is particularly apt in this instant matter, where the mandatory $5,000 is such an enormous percentage of the annual State Senator's salary, indeed as already shown essentially equal to the percentage found to be unconstitutional per se by *Bullock, supra*.

153. Jurists in the Fourth Circuit had an occasion to address certain constitutional infirmities created by suspect filing fee requirements starting with the case of *Dixon .v Maryland State Administrative Board of Election Laws*, 686 F. Supp. 539 (Md. Dist. 1988).

154. The fee at issue totaled $150 and the law allowed a candidate to ask the fee to be waived by filing an affidavit alleging indigency. Id at 540.

155. The $150 applied to both write-in candidates and those running to be a party nominee. Id.

156. "The first question" said the District Court "here presented is the standard under which the Court is to review the $150 filing fee." Id.

157. As indicated above, the *Bullock* Court said the filing fee regime in that case had to be "closely scrutinized" as *Dixon* correctly pointed out. Id.

158. While not disputing the need for such stringent review given the exclusionary nature of the large fees in *Bullock*, the district court said the "$150 fee involved in this case is far more modest than the fees involved in *Bullock* or those which were struck down, under at least implicit use of a close scrutiny standard, in *Lubin v. Panish*." Id at 141.

159. Moreover, the lower court said Maryland's fee scheme, "unlike the Texas and California statutes challenged in *Bullock* and *Lubin*," provided a waiver opportunity under certain circumstances. Id.

160. The lower court believed "when the Maryland fee" is examined as a matter of political practicality, the $150 amount doesn't pose a "significant obstacle" for a serious candidate to get access to the primary ballot. Id.

161. Accordingly, the lower court believed the traditional "rational basis" standard should be applied and found no constitutional objection to the fee under the Equal Protection Clause of the Constitution of the United States.

162. The Fourth Circuit had occasion to review, and then reject, the lower analysis on appeal in the case of *Dixon v. Md. State Administrative Board of Election Laws*, 878 F. 2d 776 (4th Cir. 1989).

163. In criticizing the lower court opinion, the Court of Appeals said the "district court addressed only the question of whether the statutes constituted a violation of the equal protection clause." Id at 778.

164. The Court of Appeals said the lower court had declared "that, in comparison with the amounts of the filing fees for ballot access invalidated by the United States Supreme Court in *Bullock v. Carter*…(invalidating mandatory ballot access fees of over $1,000) and *Lubin v. Panish*…(invalidating a mandatory ballot access fee of over $700), the $150… at issue was not "a significant obstacle" and thus only applied the rational basis test. Id.

165. But the Court of Appeals concluded the lower court had not properly assessed the impact of filing fees on the right to vote as the rights of candidates and voters in these circumstances are interconnected, as *Bullock* and other cases have discussed. Id at 779.

166. The Court of Appeals said a judicial review of a challenged filing fee requires not merely an equal protection analysis but a First Amendment analysis to ensure a state statutory scheme isn't unconstitutionally infringing on the precious rights of citizens therein enshrined. Id.

167. The seminal case of *Anderson v. Celebrezze*, 460 U.S. 780 (1983), along with *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989), were cited as offering a more appropriate judicial review standard to ensure the constitutional rights at issue in a filing fee ballot access case are ere properly protected from illegal state infringement. *Dixon*, *supra* at 780.

168. "We think that *Eu* and *Anderson*…dictate the applicable analysis to be employed in resolving the questions raised in this case." Id.

169. The *Anderson* standard, as it is generally referenced, is a balancing test requiring the government to meet a far higher burden than mere "rationality" while not being required to scale the "strict scrutiny" hurdle frequently required when fundamental voting rights are under attack from state politicians.

170. "We therefore hold the fee requirement challenged in this lawsuit unconstitutional," declared the Fourth Circuit in reversing the lower court. Id at 786.

171. Plaintiff therefore submits, as a matter of settled constitutional law in this Fourth Circuit, not to mention the country, the following: the $5,000 fee at issue in the instant matter, being 3300% higher than in *Dixon*, being significantly higher than the filing fee required to run for the Democratic nomination for Governor of Virginia, being nearly 1400% higher than the filing fee required in the state-run Democratic primary for State Senate, being roughly equal to the hugely expensive filing fee at issue in *Bullock*, is unconstitutional per se under any standard, be it *Bullock*, *Lubin*, *Anderson*, *Eu*, or *Dixon*, *supra*.

## UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

172. Article II, Section 4 of the Constitution of Virginia says the "General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, conduct and administration of primary, general, and special elections…"

173. Accordingly, this governmental legislative power, granted by the Constitution of Virginia, and so entrusted by the people to their publicly elected legislators, has been delegated to the DPVA, a private entity under Virginia law, pursuant to Va. Code Section 24.2-508 as the main culprit in this unconstitutional statutory scheme.

174. When the DPVA, through its subsidiary entities, uses this power to create the process for selecting their nominee in the Seventh Senate District Special Election, said action becomes "state action" and thus subject to the same constitutional restrictions as if implemented by the General Assembly of Virginia. *Allwright,* supra.

175. Even a cursory reading of the statute in question exposes the failure of the General Assembly to provide the DPVA with the minimum guardrails required when legislative power is given to a private actor. See, e.g., *Eubank*, *General Electric*, and *Yick Wo*, *supra*.

176. The delegation of such awesome power must satisfy the Due Process Clause of the 14th Amendment to the United States Constitution, enacted to prevent government abuse of power. See, e.g, *DeShaney v. Winnebago County*, 489 U.S. 189 (1989).

177. The Due Process Clause limits the manner and extent to which a state legislature may delegate legislative authority to a private party. See, e.g., *Yick Wo*, *supra*.

178. Since *Allwright* had already answered the "state action" issue, the DPVA only had the power to impose a $5,000 filing fee and such other requirements required of any potential candidate if the General Assembly had such power and, furthermore, if the General Assembly also provided guard rails to make sure the DPVA took such actions as would be constitutional had they been contained in state legislation.

179. The failure of the relevant Virginia statutes to provide any, much less sufficient, limitation, on the Party's authority runs afoul of the Due Process Clause.

180. Accordingly, the statutes are facially defective.

181. Indeed this fatal infirmity leads directly to the huge variance in comparable fees not only for DPVA nomination contests but in comparison to filing fees charged by their Republican Party counterparts.

182. As a matter of constitutional law, the General Assembly of Virginia couldn't pass a statute requiring such huge and varying filing fees.

183. The very arbitrariness and potential caprice prohibited by the Due Process Clause has long been running rampant in the Virginia political system.

184. Accordingly, the statutes used to justify the DPVA imposing a $5,000 fee violate the U.S. Constitutional prohibition against an unrestricted delegation of legislative power as occurred in the instant matter.

## STATUTORY SCHEME VIOLATES THE FIRST AMENDMENT

185. The First Amendment contains our core political rights. *Meyer v. Grant*, 488 U.S. 414 (1988).

186. Even the Democratic Party itself concedes the five-day window allowed for the nomination process is patently unfair to those wanting to run for the nomination, their supporters, indeed for those citizens who want to vote to pick the party nominee for the Special Election. See the Democratic Party of Virginia Party Plan.

187. As indicated previously, the Party Plan makes plain seven-days' notice is the bare minimum such notice considered fair for alerting candidates and democratic voters as regards an upcoming "firehouse primary" to choose a nominee. Id.

188. Accordingly, the five-day maximum for conducting such a process permitted by state law poses a very heavy burden on fundamental political and voting rights enshrined in the First Amendment.

189. It is well settled a state must satisfy a weighty burden to justify imposing such a burden. *Anderson, supra.*

190. As a general rule, close if not strict scrutiny would likely be required as the applicable judicial review standard since fundamental political rights are at stake. See *Bullock* and *Harper, supra.*

191. However, even using the *Anderson* standard, the state cannot meet the burden required to show why the five-day limit isn't unconstitutional as applied in this instant matter.

192. The Special Election has been set for January 10, 2023.

193. There is easily sufficient time to provide more than five days for candidates to file, get campaigns organized, and start reaching out to voters in order to have a fair nomination process in time to field a winning candidate at the polls on January 10, 2023.

194. Instead the Governor and the Senate President Pro Tempore, in issuing their Writs, in effect turned shrunk the First Amendment into a five-day process, completely unfair to the people.

195. The Call To Caucus requiring the "firehouse primary" was only formally made available to the people and the candidates on or about November 16.

196. In effect, the state statutory scheme, as applied by the political leaders in this instance, all but fully obliterated the ability of any potential candidate disfavored by the political establishment to mount a credible campaign.

197. Admittedly the timeline for a Special Election is necessarily truncated if a new Senator is to be chosen in time to take a seat when the General Assembly Session opens next year.

198. The state has a constitutional obligation to try and choose the option most protective of the right to vote and the other related rights under the First Amendment.

199. This has not been done, indeed quite the opposite has occurred.

## MOOTNESS

200. Plaintiff expects one or more of the Defendants to say this matter is moot since the Democratic Party has already chosen a nominee in the Seventh Senate District and cancelled the "firehouse primary."

201. This argument is badly misplaced since there was no "firehouse primary" and, therefore, the voters had no role whatsoever in the process.

202. Moreover, under the doctrine of "capable of review, yet evading" is most germane in this instant matter. *Roe v. Wade*, 410 U.S. 113, 125 (1973) quoting *Southern Pacific Terminal Company Co. v ICC,* 219 U.S. 498, 515 (1911). See also *Moore v. Ogilvie*, 394 U.S. 814 (1969), a case involving voters' rights.

203. Plaintiff Turpin fully intends to run for the State Senate in 2023 whether as an incumbent or a challenger.

204. Under the state statutes at issue, the Party bosses have the power to choose another Caucus process, similar to the process used in this Special Election, and impose a $5,000 mandatory filing fee, indeed a higher filing fee in effort to block a candidate they don't favor from being on the nomination ballot, indeed in effect stopping the disfavored candidate from being nominated.

205. Accordingly, the need for the federal courts to resolve this important constitutional issue quickly and permanently to prevent continued repetition is undeniable.

206. Va. Code Section 24.2-508 was last amended in 1993.

## STANDING

207. The cases cited *infra* make clear both the denied candidates and the denied voters each and together have standing to stop the unconstitutional actions delineated herein.

208. There is no federal case requiring any potential candidate to pay an unconstitutional filing fee and risk, as in the instant matter, losing $5,000 in what may be an unfair, undemocratic process.

209. Since the Party cancelled the nominating election, this is the rare case where there is no need to overturn an election – since the $5,000 fee is the reason the voters were totally disenfranchised.

210. Plaintiff, as a candidate and voter, is properly alleging specific harm, caused by the actions discussed herein, and attributable to the unconstitutional delegation of legislative power.

211. Should the members of the Virginia Board of Elections not be temporarily enjoined from certifying the outcome of this unconstitutional process, Plaintiff will suffer immediate, irreparable, and irreversible harm.

212. At all times, the appropriate state officials could have prevented this constitutional travesty.

213. Plaintiff also has standing as Plaintiff has a right to seek monetary damages for violation of these rights and is asking the Court to award at least $1 in such damages. *Uzuegbunan v. Preczewski,* 141 S. Ct. 792 (2021).

## PRELIMINARY INJUNCTION IS JUSTIFIED

214. "A preliminary injunction is an extraordinary remedy." *Real Truth About Obama v. Federal Election Commission,* 575 F. 3d 342 (4th Cir. 2009).

215. The Fourth Circuit applies the standards articulated in *Winter v. Natural Resources Defense Council Inc,* 129 S. Ct 365 (2008) in deciding whether or not to grant a motion for a preliminary injunction. *Real Truth, supra* at 345.

216. The *Winter* standard consists of four distinct factors. Id.

217. This requires the plaintiff to establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Id at 346 citing *Winter*.

218. All four requirements must be met. Id.

219. As to the first requirement, Plaintiff has demonstrated far more than a likelihood of success on the merits. *Bullock*, *supra*, has already declared a hugely outrageous fee of 32% of the annual salary to be unconstitutional per se.

220. Thus the $5,000 filing fee in the instant matter, roughly 27.8% of the annual salary for a State Senator, is equally per se unconstitutional.

221. Moreover, the delegation by a state legislature of filing fee setting power can only be constitutional unless, at a minimum, such delegation is accompanied by statutory language making it crystal clear the law in question cannot charge whatever filing fee amount the Party bosses please.

222. The delegation of authority from the General Assembly contains no legislatively defined limit, indeed the delegation is devoid of such criteria as is demonstrated not only by the $5,000 fee (there is nothing in the law preventing a $50,000 fee) but also by the fact that on information and belief, the fees for Special Elections vary widely among different Senate District nominating committees inside the Democratic Party, not to mention variances as compared with those of the Republican Party.

223. Additionally, the five-day requirement in the challenged statutory scheme obliterates the definition of a fair election process as defined by the Party Plan of the DPVA, along with the fact there is no compelling state interest to justify such destruction of First Amendment rights given the available timeline in the instant matter.

224. Accordingly, for the reasons set forth, the Court must conclude Plaintiff is likely to succeed on the merits.

225. As to the second prong, that being the likelihood of the Plaintiff suffering irreparable damage, the very circumstance of this matter demonstrates such harm.

226. Once the State Board of Elections certifies Mr. Rouse as a winner, once the ballots are printed with his name as the Democratic nominee, and once election day approaches, there is very little likelihood of a court stopping the process midstream, voiding a nomination, and ordering a new nomination process despite Plaintiff being found to have won on the merits.

227. Since Plaintiff is likely to win on the merits, a failure to issue a preliminary injunction means this  case would proceed as normal, and should Ms. Turpin prevail, there would exist no remedy to rectify this denial of fundamental constitutional protections.

228. Admittedly, the Court could decide that while Plaintiff might be denied the chance to run in the Special Election, she will achieve success by ensuring such a situation can never be replicated should the Court rule the statutory scheme, the $5,000 and the 5-day limit prospectively prohibited.

229. While this outcome is surely in the interests of the people of the Commonwealth, it would still sanction irreparable specific to the Plaintiff.

230. At the same time, Mr. Rouse would have an unfair windfall benefit earned not as matter of merit or right, but rather due to the failure of the defendant members of the Board of Elections to ensure the integrity of our election process as required and the decision of the state's politicians to put the needs of their cronies ahead of the voting rights of the people.

231. Accordingly, the second prong of the *Winter* standard has been met.

232. Mr. Rouse gains nothing from a cloud of over his nomination, nor can he be said to have earned a nomination merely because he could afford to pay an unconstitutional filing fee seemingly imposed by those to help hand him an uncontested nomination.

233. Without a preliminary injunction, the failures of the members of the State Board of Elections, and failures of those issuing the Writ of Election to put the First Amendment rights of their constituents as priority one would be rewarded.

234. Accordingly, when the equities are properly weighed, the public interest is surely best served by a few days delay to ensure not just Democrats, but all the citizens in the Seventh Senate District get to cast not just a vote, but an effective vote both during the nomination process and then the general election. *Williams*, supra.

235. Thus, the third prong of the *Winter* test is satisfied.

236. Focusing on the final prong, a preliminary injunction is manifestly in the public interest.

237. Given the growing public skepticism toward our election process, a failure to grant a preliminary injunction only risks heaping more fuel on that fire.

238. In that connection, the interests of the DPVA, along with the defendant members of the Board of Elections, the Governor, and the Senate President Pro Tempore, not to mention Mr. Rouse, would clearly be better protected by increasing, not decreasing, public respect for our electoral system.

239. Indeed, it must be presumed the Governor, the Senate President, the General Assembly, and others would see the elimination of an unconstitutional system of filing fees as being totally in the public interest.

240. Accordingly, the 4th prong of the *Winter* test has been met.

241. Therefore, as required, Plaintiff has met all four of the required parts of the *Winter* standard.

242. The *Winter* standard having been easily met, a preliminary injunction, to ensure the protection of the most fundamental voting rights in our system, the right to vote being the protector of other rights, should be issued in this matter.

## COUNT ONE: VIOLATION OF THE DUE PROCESS CLAUSE

243. Plaintiff incorporates by reference paragraphs 1 through 242, *supra*.

244. The 14th Amendment, of which the Due Process Clause is part, incorporates certain of rights provided to citizens by the Bill of Rights, such rights among them found in the First Amendment. *Palko v. Connecticut*, 302 U.S. 319. 324 (1937).

245. The 14th Amendment limits the nature of the delegation of power the General Assembly of Virginia could give a private entity such as the Democratic Party of Virginia. See, e.g., *General Election*, *supra*.

246. It is axiomatic that a General Assembly can't authorize a private party to do indirectly what the government is constitutionally prohibited to do directly. *Allwright*, *supra*.

247. Therefore, in the context of the instant matter, the General Assembly could not give the Democratic Party of Virginia the power to impose the mandatory $5,000 filing fee, equal to roughly 27.8% of the annual salary for a State Senator, unless the General Assembly itself had the power to impose such a mandatory fee.

248. Moreover, even assuming, *arguendo*, if a state legislature had this power, the delegation of this legislative power to a private party such as the DPVA allowing it to impose such a huge filing fee would need to be accompanied by clearly defined criteria indicating how a fee amount can be determined and what maximum amount is permitted. Id.

249. As indicated previously, the Code of Virginia sets the filing fee for a state Senator seeking a party nomination in a state-run primary at a flat 2% of the annual salary, amounting to $360.

250. Accordingly, Plaintiff is challenging the constitutionality of the statutory scheme, 24.2-508 being the main culprit, as both unconstitutional on its face and unconstitutional as applied.

251. Therefore, Plaintiffs' rights guaranteed under the United States Constitution are being violated, inflicting significant harm on the exercise of fundamental core political rights, such harm only possible because the state legislature acted unconstitutionally, allowing the DPVA to arbitrarily trash fundamental political while Virginia State Board of Elections pretends not to notice.

252. Plaintiff asks that the Court declare the statutory scheme, with 24.2-508 the main culprit, unconstitutional, that the state be permanently enjoined from enforcing said laws, that the

DPVA be enjoined from imposing any filing fee exceeding 2% in any of their nomination contests for state or local office, and such other relief as the Court deems justified to ensure a constitutionally fair process in the Special Election process at issue in the instant matter, including costs and attorney fees where appropriate.

## COUNT TWO: $5,000 FILING FEE VIOLATES THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION AND THE FIRST AMENDMENT OF THE U.S. CONSTITUTION

253. The plaintiff incorporates by reference paragraphs 1 through 252, *supra*.

254. A $5,000 filing fee, equal to roughly 27.8% of the annual salary of a State Senator is unconstitutional per se based on *Bullock* and *Lubin*, as it imposes an excessive and damaging exclusionary scheme to deny not merely candidates the ability to get on the ballot but more importantly severely burdens the fundamental rights of voters protected.

255. Plaintiffs believe there is no possible standard of review, be it a rational basis test, the *Anderson* balancing test discussed *supra*, or the type of strict scrutiny applied in *Harper*, that could be used justify such a fee as necessary to protect a compelling state interest. .

256. As discussed *supra*, the filing fee for the Governor is only $3,500, the highest lawfully justified by any state statute.

257. Moreover, it is useful to restate the following principle: it is axiomatic that a state legislature cannot delegate to a private party even a political party statutory power to do indirectly what the General Assembly is constitutionally or lawfully forbidden to do directly.

258. The Equal Protection Clause requires that to the extent possible, the filing fee for all the State Senate districts be the same for those seeking office and their supporters.

259. The 2% statutory fee scheme required by state law for the state-run nomination process is clearly designed to achieve the equal protection of the laws in that regard.

260. As shown supra, the damage to core political rights protected by the First Amendment is apparent as well. Anderson, supra.

261. Plaintiff asks the Court to declare the $5,000 fee unconstitutional, and to void the outcome of any nominating process using such a fee in the past thirty days.

262. Plaintiffs further ask the Court to enjoin the State Board of Elections from certifying to the general election ballot the nominee of any such process and to award such other relief as it deems justified, including costs and attorney fees where appropriate.

## COUNT THREE: THE FIVE-DAY LIMIT VIOLATES THE FIRST AMENDMENT.

263. The Plaintiff incorporates herein paragraphs 1 through 263, *supra*.

264. The political rights of the Plaintiff, as both a candidate, and as a voter with a protected constitutional right to cast an effective vote for someone to represent her interests and those of similar priorities in the General Assembly, have been unconstitutionally, and unnecessarily damaged by the five-day rule. Va. Code Section 24.2 510(5).

265. As indicated, even the Democratic Party of Virginia Party Plan concedes the five-day rule is patently unfair to all citizens, especially those who want to participate in a nomination

process, be they potential candidates, active supporters of a candidate, or merely a citizen who wants to exercise their fundamental political rights.

266. Given that the core political rights being infringed are among our most protected political rights, the state will need to overcome the highest possible strict scrutiny to demonstrate this five-day rule is absolutely necessary to protect a compelling state interest. *Meyer v. Grant*, 486 U.S. 414 (1988).

267. In that connection, Plaintiff believes the statute is facially unconstitutional.

268. Plaintiff also believes the statute is unconstitutional as applied in the instant matter under either the Anderson test or a rationality test.

269. Plaintiff believes there is sufficient time available before the January 10, 2023, date of the Special Election, to provide a fair process for the exercise of the fundamental political rights enshrined in the First Amendment while at the same time protecting the compelling interests the state has in insuring a fair process.

270. Therefore, Plaintiff believes the five-day restriction can't survive constitutional scrutiny either on a facial or applied bases.

271. Plaintiff therefore believes the five-day rule violates the U.S. Constitution both as written and as applied in this instant matter.

272. Plaintiff therefore asks the Court to enjoin state officials from enforcing the five-day rule in the instant matter, an order the Governor and Senate President to issue a new Writ of

Election to fill the 7th Senate District vacancy, such Writ containing sufficient and time for the DPVA to conduct the fair and open nomination process enshrined in the First Amendment.

## REMEDY

For the reasons stated above, based upon fact and law, comes now Plaintiff asking this Honorable Court for the following relief:

(A)     Issuance of a preliminary injunction against the Defendant members of the Virginia Board of Elections preventing them from voting to certify the results of the DPVA nomination process for the Seventh Senate District as already reported or expected to be reported by the Chairperson the DPVA until such time as a decision on the merits of this complaint has been made or the matter otherwise settled; and in can be properly adjudicated.

(B)     A Declaratory Judgment finding Va. Code Section 24.2-508 as facially unconstitutional or in the alternative as unconstitutional as applied in this instant matter on the grounds it constitutes an unconstitutional delegate of legislative authority; and

(C)     A Declaratory Judgment finding the $5,000 filing fee at issue in this matter to be unconstitutional; and

(D)     A preliminary injunction capping the dollar amount of any filing fee at 2% of the annual salary of the office sought until as such time the General Assembly passes legislation that permits the Democratic and Republican parties from charging higher than 2% if the criterion in such legislation constitutionally permits; and

(E)     A declaratory judgment that Va. Code Section 24.2 520(5) is facially unconstitutional for it limits all potential candidates and their supporters to a five-day nomination campaign in all cases, and unconstitutional as applied in this instant matter based on the facts; and.

(F)     An Order that Orders the Governor and the Senate President to issue a Writ of Election, consistent with the time raining before January 10, 2023, that allows an effective use of the core political rights involved when candidates and voters join in a political campaign; and

(G)     Monetary damages, of at least $1 dollar; and

(H)     Such other relief as the Court may believe if necessary, including the award of attorney fees and costs should the Plaintiff be deemed the prevailing party.

Respectfully submitted by:

Cheryl Turpin

4508 Willow Croft Drive
Virginia Beach, VA 23462
CBT.012316@gmail.com

757-282-1970

757-965-9763

*Pro se*

**CERTIFICATE OF SERVICE** *delivered by hand.*

THIS IS TO CERTIFY that on November 23, 2022   I mailed this Complaint for Declaratory Judgement and Preliminary Injunction to the Clerk of the Court in paper form via U.S. mail. A true copy of said complaint was also sent, via first class mail, to:

The Honorable Glenn Youngkin
Office of the Governor
111 East Broad Street
Richmond, VA 23219

The Honorable L. Louise Lucas
Office of the Senate President
900 E. Main St.
Room E604
Richmond, VA 23219

Robert Brink
John O'Bannon
Georgia Alvis Long
Donald Merricks
Angela Chiang
Susan Beals
1100 Bank Street
First Floor
Richmond, VA 23219

Susan Swecker
Sandra Brandt
Democratic Party of Virginia
919 East Main Street
Richmond, VA 23219

Cheryl Turpin

4508 Willow Croft Drive
Virginia Beach, VA 23462
CBT.012316@gmail.com
*Pro se*